1  COOLEY GODWARD KRONISH LLP
   CHARLES M. SCHAIBLE (Bar No. 173107)
2  101 California Street, Fifth Floor
   San Francisco, California 94111-5800
3  Telephone: 415.693.2000
   Facsimile: 415.693.2222
4  cschiable@cooley.com

5  COOLEY GODWARD KRONISH LLP
   DOUGLAS P. LOBEL (*pro hac vice*)
6  DAVID A. VOGEL (*pro hac vice*)
   11951 Freedom Drive
7  Reston, Virginia 20910
   Telephone: 703.456.8000
8  Facsimile: 703.456.8100
   dlobel@cooley.com | dvogel@cooley.com
9
   Attorneys for Defendant
10 *E*TRADE Securities LLC*

11

12                    UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14                     SAN FRANCISCO DIVISION

15

16 JOSH MANGINI,                      )
                                      )  Case No. C 07 5264 SI
17            Plaintiff,              )
                                      )  **DEFENDANT'S OPPOSITION TO**
18     v.                             )  **PLAINTIFF'S MOTION TO REMAND**
                                      )  **ACTION TO STATE COURT**
19 E*TRADE SECURITIES LLC,            )
   a Delaware Limited Liability Company, ) Date:   January 25, 2008
20                                    )  Time:   9:00 a.m.
              Defendant.             )  Place:  Courtroom 10
21 _____)

22        Plaintiff Josh Mangini ("Mangini") seeks to remand this case (*see* Docket No. 16) based on

23 his admitted speculation that the required jurisdictional amount has not been met.  Below,

24 E*TRADE Securities LLC ("E*TRADE") presents more than sufficient evidence to meet its burden

25 to support federal diversity jurisdiction.  The Court should deny the Motion to Remand.

26        Defendant E*TRADE removed the case on diversity jurisdiction grounds, specifically those

27 under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332.  *See* E*TRADE Notice of

28 Removal (filed Oct. 16, 2007) (Docket No. 1) ("Notice of Removal").  CAFA provides diversity

jurisdiction for putative class-action lawsuits where, *inter alia*, the net amount in controversy (accumulated for all putative class members) exceeds $5 million.  28 U.S.C. § 1332(d)(2).

Mangini seeks a refund of certain fees paid by E*TRADE customers.  E*TRADE's Notice of Removal alleged that Mangini's proposed class definition would include more than enough class members for the total potential amount at issue to exceed $5 million.

In seeking to remand the case for lack of diversity jurisdiction, Mangini claims he seeks average damages of $20 per class member.  Mangini admits, however, that he has no idea how many putative class members might exist.  Evidence from an E*TRADE witness, based on E*TRADE's records, demonstrates that there would potentially be sufficient class members to meet the $5 million requirement based on Plaintiff's proposed class definition.  Consequently, the Court should deny Mangini's Motion to Remand.

### STATEMENT OF RELEVANT FACTS

### I.    ALLEGATIONS IN THE COMPLAINT

E*TRADE assumes all facts in the Complaint to be true for purposes of establishing that removal is proper.

According to the Complaint, Mangini alleges that he was a customer of E*TRADE's online brokerage securities services.  Complaint ¶ 4.  Mangini opened an online trading account in March 2006.  *Id.* ¶ 21.  E*TRADE's standard customer agreement provides that an account is subject to a quarterly "account maintenance fee" ("AMF") of $40 under certain circumstances, primarily if the account is inactive for a certain period.  *Id.* ¶ 23.  The customer agreement states that the fee is assessed if the customer has not executed at least two trades within six months or has a low balance (under $5,000), and the account has been open for at least 12 months as of the date the fee is assessed.  *Id.* ¶¶ 14-16 & Exhibit B to the Complaint.

Mangini admits that he was subject to the fee because, *inter alia*, he had been a customer for at least 12 months on the date the fee was assessed.  *Id.* ¶¶ 22-23.  However, in an effort to avoid the $40 fee, Mangini mangles the words of E*TRADE's customer agreement.  Mangini claims that he was not eligible to be assessed the full fee because he had not been a customer for a full year during the entire quarter in which the fee was assessed.  *Id.* ¶ 12.

1   On these facts, Mangini asserts a single cause of action – that E*TRADE breached his

2   customer agreement by assessing the fee when it was not authorized. *Id.* ¶ 35.  Mangini recognizes

3   that his customer agreement with E*TRADE is governed by New York law. *Id.* ¶ 20.

4   Mangini seeks certification of a class of customers who were assessed the fee under similar

5   circumstances. *Id.* ¶ 24.

6   **II.    E*TRADE'S NOTICE OF REMOVAL**

7   On October 16, 2007, E*TRADE removed Mangini's Complaint to this Court on the basis

8   of diversity jurisdiction under 28 U.S.C. § 1332(d), which was added by CAFA.  CAFA provides

9   federal diversity jurisdiction for Mangini's case if three factors are met:

10      (1)    The number of putative class members is over 100;

11      (2)    Some of the class members are not citizens of the states in which E*TRADE

12          is a citizen; and

13      (3)    The aggregate value of the class-wide damages likely exceeds $5 million,

14          exclusive of interest and costs.

15  E*TRADE demonstrated that all three factors are present.  Notice of Removal ¶ 11.

16  Mangini's motion to remand challenges only the third factor, namely, whether the minimum amount

17  of $5 million is in controversy.

18  **STANDARD OF REVIEW**

19  Where, as here, the complaint "seeks no specific amount in damages," E*TRADE need only

20  show by the "preponderance of the evidence" that the minimum amount is met.  *Lowdermilk v.*

21  *United States Bank Nat'l Ass'n*, 479 F.3d 994, 998 (9th Cir. 2007); *accord* Pl. Mem. at 6 & n.1.

22  The Ninth Circuit has not addressed precisely what threshold of evidence a defendant needs to

23  establish a *prima facie* argument for federal jurisdiction.  However, in a passage cited in

24  *Lowdermilk* as "not to the contrary" with the Ninth Circuit law, *id.* at 999 n.6, the Seventh Circuit

25  stated that a defendant need only show a "reasonable probability that the stakes exceed the

26  minimum [amount in controversy]."  *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 449

27  (7th Cir. 2005).  Because the Complaint does ***not*** aver an express amount in controversy less than

28

1  the $5 million threshold, E*TRADE does **not** need to provide absolute assurance that the threshold

2  is surpassed.[1]

3  ## ARGUMENT

4  ### I.    MANGINI DOES NOT CONTEST MOST OF THE CAFA

5  ### FACTORS ESTABLISHING FEDERAL JURISDICTION

6  Mangini concedes that two of the three factors for removal under CAFA are present.

7  Mangini affirmatively alleges that the first CAFA factor (at least 100 putative members) is present.

8  Complaint ¶ 25 (alleging "the members of the class are believed to number in the thousands, if not

9  more").  Mangini also does not dispute the second factor, that some members of the class are not

10 citizens of Delaware or New York, where E*TRADE is a citizen for diversity purposes.  Notice of

11 Removal ¶ 9; *see also* Declaration of John Matos (Docket No. 11) ¶ 15 (likely class members will

12 be throughout the country) ("Matos 1st Decl."), filed in support of E*TRADE's Motion to Transfer

13 Venue to S.D.N.Y. (filed Nov. 2, 2007) (Docket No. 9).

14 In addition, Mangini does not invoke CAFA's exceptions to federal jurisdiction.  In its

15 discretion the Court can decline jurisdiction under CAFA if the named plaintiff and defendant are

16 citizens of the same state, or if more than a third of the putative class members are from the same

17 state.  28 U.S.C.A. §§ 1332(d)(3) & (d)(4), & (d)(4)(A)(i)(II)(cc).  Neither condition is true here.

18 Notice of Removal ¶ 12; Matos 1st Decl. ¶¶ 4, 15.[2]  It is Mangini's burden to show that one of these

---

19 [1]    The Ninth Circuit (and others) do sometimes require a defendant to prove the amount in

20 controversy is met to a degree of "legal certainty" – an exactingly high standard – but that standard
   only applies where (not here) the Complaint expressly avers an amount less than the minimum

21 threshold.  *Lowdermilk*, 479 F.3d at 999-1000.

22 [2]    Mangini incorrectly alleged that E*TRADE is a "citizen" of California on the mistaken
   assumption that E*TRADE's principle place of business is in California.  The Court can take

23 judicial notice of public documents recognizing that E*TRADE's principle place of business is 135
   East 57th Street, New York, New York 10022.  E*TRADE, as a registered broker-dealer, is

24 regulated by the Financial Industry Regulatory Authority ("FINRA"), formerly called the National
   Association of Securities Dealers ("NASD").  FINRA maintains public documents, called
   "BrokerCheck Reports," available on its website, concerning every licensed brokerage firm.

25 FINRA's BrokerCheck Report for E*TRADE "is governed by federal law, Securities and Exchange
   Commission (SEC) regulations and FINRA rules approved by the SEC."  *See*

26 www.finra.org/brokercheck, relevant pages attached to E*TRADE's Request for Judicial Notice
   (Docket No. 3), Exhibit A.  The BrokerCheck Report for E*TRADE states that "E*TRADE

27 Securities LLC" (the Defendant here) has its "Main Office Location" at 135 East 57th Street, 31st
   Floor, New York, New York, and "E*TRADE Securities LLC" is "Regulated by FINRA New York

28 Office."  *Id.*

OPPOSITION TO MOTION TO REMAND

349036 v1/RE

1  exceptions could apply, *Serrano v. 180 Connect, Inc.*, 478 F.3d 1018, 1021-24 (9th Cir. 2007)

2  (plaintiff moving to remand bears burden of proving CAFA exceptions to jurisdiction), and Mangini

3  has not attempted to do so.

4  **II.    THE EVIDENCE SUPPORTS THE REASONABLE PROBABILITY**

5  **THAT THE AMOUNT IN CONTROVERSY EXCEEDS $5 MILLION**

6      Consequently, the Court need only evaluate Mangini's argument that E*TRADE has not

7  proven "by a preponderance of the evidence" that the amount in controversy is met.

8      As an initial matter, E*TRADE accepts Mangini's characterization that he seeks only a

9  partial refund of his $40 fee, and as Mangini argues, the "average" refund for each class member

10  would be $20.  Pl. Mem. at 5.[3]

11      The $5 million minimum amount in controversy is met if the potential class has at least

12  250,000 putative members (that is, $5 million divided by $20/member).  The evidence amply

13  supports that conclusion.

14      **A.    9,616 Class Members Per Quarter**

15      **Would Satisfy The Jurisdictional Requirement**

16      First, simple math shows that the jurisdictional minimum is conservatively met if the lawsuit

17  includes as few as 9,616 class members per calendar quarter.  In fact, the actual number of class

18  members needed per quarter is probably even fewer, as discussed below.

19      The Complaint does not allege a specific period for the class, either a starting or stopping

20  point.  Instead, it broadly defines the class as "all persons . . . who were charged" E*TRADE's

21  AMF.  Thus, the beginning period of the class would be anyone charged the fee within the statute of

22  limitations of the lawsuit.  The statute of limitations extends back six years under New York law.[4]

23  Since the lawsuit was filed on September 13, 2007, the class period would start with customers who

24

25  [3]    E*TRADE accepts this characterization **only** for purposes of this briefing on remand, but
26  believes that Plaintiff's assertion that he is entitled to a partial refund is inconsistent with the plain
    reading of the Customer Agreement.  E*TRADE reserves its right to challenge this at a later time.

27  [4]    The Complaint asserts a breach of contract claim under New York state law, and New York
    imposes a six-year statute of limitations for claims of breach of express contract.  N.Y. C.P.L.R.
28  213(2).

349036 v1/RE

were first assessed an AMF fee after September 13, 2001.  E*TRADE charges the AMF four times

a year, at the end of each calendar quarter.  *See* January 4, 2008 Declaration of John Matos in

Support of Defendant's Opposition to Plaintiff's Motion to Remand ("Matos 2d Decl.") ¶ 4.  The

first AMF that is within the class period, therefore, is the fee charged for the third quarter of 2001

("3Q01"), which was charged in late September 2001.  Matos 2d Decl. ¶¶ 3-4.  Furthermore,

Plaintiff's proposed definition of the class includes any customer charged the fee up to the present

(even after the lawsuit was filed), because E*TRADE continues to charge the AMF to customers.

(E*TRADE, of course, strongly disagrees that its fee assessment breached its customer agreements

with customers, but that is not germane to determining the time period of the class.)

Starting six years before the filing of the lawsuit (3Q01) and continuing to present (the last

fee was assessed in 4Q07), the class would include customers assessed AMF charges in 26 quarters.

Thus, the jurisdictional amount would be met if an average of 9,616 customers were assessed AMF

fees for 26 quarters (9,616 times 26 exceeds 250,000).

The need for at least 9,616 class members per quarter is a conservative figure.  As the

lawsuit continues, more quarters will be added to the class and the average number of class

members per quarter needed to establish federal jurisdiction will decrease proportionately.  For

example, if the lawsuit continues through trial in roughly two years, another eight quarters of AMF

fees will be included – for a total of 34 calendar quarters in the lawsuit.  In this case, an average of

7,353 class members per quarter are needed for 34 quarters to meet the jurisdictional amount (7,353

times 34 exceeds 250,000).

**B.**     **E*TRADE Data Shows That The Average Number Of**

**Class Members Far Exceeds 10,000 Per Calendar Quarter**

Reasonable extrapolations of E*TRADE's available data readily support the conclusion that

the number of potential class members per quarter would far exceed 9,616.

E*TRADE assessed the AMF in December 2007 (for 4Q07) to 372,674 accounts.  Matos 2d

Decl. ¶ 5.  Of these accounts, 9,247 were customers who would be in Mangini's putative class

definition – that is, customers who had been E*TRADE customers for 12 months at some point

1  during 4Q07. *Id.* ¶ 6. Thus, about 2.48% (9247 divided by 372,674) of those assessed AMF

2  charges are potential class members for this quarter. *Id.* ¶ 7.

3          Applying this 2.48% factor to the exact number of AMF charges over the past eleven

4  quarters – for which data is readily available, *id.* ¶¶ 9, 11 – the number of potential class members

5  per quarter is estimated as follows:

6
|         *Quarter* | *Potential Class Members* |
|---|---|
| 3Q07 | 9,420 |
| 2Q07 | 9,845 |
| 1Q07 | 10,190 |
| 4Q06 | 10,011 |
| 3Q06 | 10,634 |
| 2Q06 | 10,920 |
| 1Q06 | 11,504 |
| 4Q05 | 9,951 |
| 3Q05 | 10,969 |
| 2Q05 | 11,611 |

12  *Id.* ¶ 9. This data shows that the average number of potential class members from 2Q05 to 4Q07

13  (eleven quarters) is 10,391. *Id.* ¶ 10.[5] Over the last three years, the potential number of class

14  members per quarter has always exceeded 9,616, except for the two most recent quarters. The

15  average number of potential class members per quarter (10,391) is far greater than 9,616.

16          E*TRADE does not have readily available data for total AMF charges in quarters before

17  2Q05; that data is all archived and would have to be restored at great time and expense. *Id.* ¶ 11.

18  Again, however, E*TRADE has no reason to believe these average figures would be different for

19  earlier quarters going back to 2001. *Id.* ¶¶ 11-13. Furthermore, the trend of data back into 2006

20  and 2005 shows that the average number of class members per quarter increases, so one would

21  expect the average per quarter to grow even higher back into earlier years. *Id.* ¶¶ 12-13.

22          This data, based on actual data and a few reasonable extrapolations, demonstrates that the

23  minimum amount in controversy is more than adequately met. The conservative average of 10,391

24  class members per quarter, times 26 quarters, times $20/class member, equates to an amount in

25

26  [5]      E*TRADE has not yet done a "hard count" of actual putative class members for each of
these quarters, because the analysis would be extremely time consuming and data-intensive. *Id.* ¶ 8.
27  However, E*TRADE has no reason to believe the 2.48% figure for 4Q07 would be different for any
reason for earlier quarters. *Id.*
28

349036 v1/RE

1    controversy of at least $5,403,320.  If the case includes up to 34 quarters, the amount in controversy

2    would exceed $7 million.

3         Mangini has not provided any evidence to the contrary, so the "preponderance of evidence"

4    is entirely in E*TRADE's favor.

5    **<u>CONCLUSION</u>**

6         For these reasons, E*TRADE respectfully requests that the Court deny Mangini's Motion to

7    Remand the case to California state court.

8    Dated:  January 4, 2008                COOLEY GODWARD KRONISH LLP

9

10

11                     By:   /s/  Douglas P. Lobel
                           Douglas P. Lobel (admitted *pro hac vice*)

12                         David A. Vogel (admitted *pro hac vice*)
                           Charles M. Schaible (Bar No. 173107)

13                         Attorneys for Defendant
                           *E*TRADE Securities LLC*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

349036 v1/RE